**MARC P. BERGER**
**REGIONAL DIRECTOR**
**Lara S. Mehraban**
**Valerie A. Szczepanik**
**Dugan Bliss**
**Daphna A. Waxman**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0971 (Bliss)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **18 Civ.    (   )** |
| | **ECF Case** |
| **Plaintiff,** | |
| **-against-** | **COMPLAINT** |
| **JON E. MONTROLL and BITFUNDER,** | **JURY TRIAL** |
| | **DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants Jon E. Montroll ("Montroll") and BitFunder (collectively "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This is an action against an unregistered bitcoin-denominated securities exchange, BitFunder, and its operator, Montroll, who defrauded exchange users by misappropriating their funds and failing to disclose a cyberattack on BitFunder's system that resulted in the theft of more than 6,000 bitcoins.  Montroll also sold unregistered securities that purported to be

investments in the exchange, but from which Montroll also misappropriated investor funds and failed to disclose the cyberattack and bitcoin theft.

2.      From December 2012 through November 2013, Montroll operated the BitFunder online platform, an unregistered securities exchange, through which users had the ability to create, offer, buy and sell virtual "shares" of various virtual currency-related enterprises in exchange for bitcoins.  Users deposited bitcoins into a virtual currency wallet maintained by WeExchange (the "WeExchange Wallet"), Montroll's Australian virtual currency exchange. Users' bitcoins were commingled in WeExchange's Wallet, which Montroll controlled at all times.  Throughout this period, Montroll misappropriated bitcoins belonging to BitFunder users from the WeExchange Wallet.

3.      Beginning on July 18, 2013, Montroll offered and sold what he called "shares" of "Ukyo.Loan" ("Ukyo Notes") on BitFunder's platform, which were unregistered securities. Montroll told purchasers of the Ukyo Notes that the funds raised would be used for "private investment purposes" and he promised to pay purchasers a daily interest rate of 0.05%.  Contrary to his representations, Montroll used a portion of the proceeds of the Ukyo Notes offering to pay personal and business expenses and to replenish bitcoins that Montroll had misappropriated from BitFunder prior to the offering.

4.      Over the course of five weeks, beginning on July 28, 2013 and continuing through August 27, 2013, a group of BitFunder users engaged in a cyberattack on BitFunder's platform that resulted in the theft of more than 6,000 bitcoins, which were valued at the time at approximately $775,075.  Montroll failed to disclose the cyberattack and resulting bitcoin theft to any users of his BitFunder platform, including Ukyo Notes purchasers.  Instead, through BitFunder, Montroll continued to solicit and accept bitcoin deposits from new Users, earn site

fees and raise proceeds from Ukyo Notes purchasers. Montroll used bitcoin deposits from new users to fund withdrawal requests after the cyberattack.

5.     Following the cyberattack and bitcoin theft, Montroll continued to operate BitFunder under a bitcoin deficit while misleading investors that it was an ongoing profitable platform. In early November 2013, users began experiencing problems withdrawing bitcoins from the WeExchange Wallet, which Montroll publically attributed to technical problems with BitFunder's system and bitcoin software in general. In reality, however, BitFunder did not hold sufficient bitcoins to cover amounts owed to its users due to Montroll's misappropriation and the cyberattack and bitcoin theft. Montroll shut down BitFunder on November 14, 2013.

## VIOLATIONS

6.     By virtue of the conduct alleged herein, Defendants engaged in securities fraud in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], promulgated thereunder; Defendant Montroll violated Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)] and 17(a) [15 U.S.C. § 77q(a)]; Defendant BitFunder violated Section 5 of the Exchange Act [15 U.S.C. § 78e]; and Defendant Montroll is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for the violations of Section 5 of the Exchange Act [15 U.S.C. § 78e] by Defendant BitFunder.

7.     Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.     The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) & (d)(5) of the

Exchange Act [15 U.S.C. § 78u(d)(1) & (d)(5)].

9.      The Commission seeks a judgment permanently enjoining Defendants from future

violations of the Securities Act provisions and the Exchange Act provisions that they violated as

alleged in this Complaint, ordering Defendants to disgorge any ill-gotten gains and to pay

prejudgment interest thereon, and imposing civil money penalties pursuant to Section 20(d) of

the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)].  Finally, the Commission seeks any other relief the Court may deem just and

appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Securities Act Section

22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendants,

directly or indirectly, singly or in concert, have made use of the means or instrumentalities of

transportation or communication in, or the instrumentalities of, interstate commerce, or of the

mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

11.      Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and

courses of business constituting the violations alleged herein occurred within this District.

Among other things, Defendants' fraudulent and misleading statements and fraudulent schemes

were made to the public at large in this District, and at least some of Defendants' victims reside

in this District.

## DEFENDANTS

12.      **Montroll**, age 37, resides in Saginaw, Texas.  Montroll developed and founded

BitFunder.  Prior to founding BitFunder, Montroll founded several technology-related ventures.

In September 2015, Montroll incorporated a Texas corporation that owns and operates a licensed

nursing facility located in Archer City, Texas, and currently serves as its President.  Montroll has never been associated with any entity registered with the Commission.

13.     **BitFunder** is an unincorporated entity that Montroll founded in October 2012 and operated out of his home in Saginaw, Texas.  From December 2012 through November 2013, through BitFunder's website, registered BitFunder users could create, offer and sell virtual shares of various enterprises in exchange for bitcoins.   At all relevant times Montroll controlled BitFunder.  BitFunder has never been registered with the Commission in any capacity.

### OTHER RELEVANT ENTITIES

14.     **WeExchange Australia, Pty. Ltd.** ("WeExchange") was founded and developed by Montroll as an online platform that exchanged virtual currency for Australian and US fiat currencies.  From July 2011 through November 2013, through WeExchange's website, registered account holders could deposit and exchange bitcoins for Australian and US dollars.   In addition to acting as a virtual currency exchange, WeExchange also kept custody of all bitcoins for use on BitFunder.  From October 2011 through September 2016, WeExchange was registered as a private company with the Australian Business Register.  WeExchange has never been registered with the Commission in any capacity.

15.     **WeExchange, Inc.** (f/k/a Code Red Servers, Inc.) is a Texas corporation that Montroll incorporated in August 2009.  In January 2012, Montroll renamed the corporation from Code Red Servers, Inc. to WeExchange, Inc.  In October 2013, Montroll incorporated a second WeExchange entity in Delaware, through which he intended to operate a US-licensed money services business ("MSB") for exchanging bitcoins to US fiat currencies.  Neither the Texas nor the Delaware WeExchange entities have ever had any operations, nor were either ever registered with the Commission in any capacity or with the Financial Crimes Enforcement Network  as a money services business.

## FACTS

### Montroll Launches the BitFunder Platform and
### Operates it as an Unregistered Securities Exchange

16.     In mid-December 2012, Montroll launched BitFunder as an online "bitcoin fund

raiser and trader."  Through BitFunder's platform, registered users of BitFunder ("Users") could

create, offer, buy and sell shares in various enterprises (referred to as "Assets" and "Asset

Shares" on the BitFunder website).  The Assets listed on the platform primarily were virtual

currency-related businesses, such as virtual currency mining operations.  Shares in respective

Assets were offered and sold by certain Users (referred to as "Asset Issuer[s]" on the BitFunder

website) to other Users on the platform in "initial offerings."  Many of the offerings promised

and paid dividends (referred to as "dividend paying asset share[s]" on the BitFunder website).

Users also were permitted to buy and sell these virtual shares in secondary market transactions

on the platform at increased prices.   Bitcoin was the only form of payment used and accepted by

Users on the platform.  Thus, the platform was marketed to and popular with virtual currency

enthusiasts.

17.     In order to deposit and/or withdraw bitcoins for use on the BitFunder platform,

BitFunder required that its Users register with WeExchange (Montroll's Australian virtual

currency exchange) and deposit bitcoins in a virtual currency wallet maintained by WeExchange.

Information posted on BitFunder's website stated that this arrangement would safeguard User

funds and included the following: "We simply do not want to open an extra security hold where

your funds can more easily be lost.  If your [BitFunder] account is somehow hacked, the funds in

the [BitFunder] account can only be sent to your WeExchange account, and not stolen like on

most sites."  Users' bitcoins were commingled in the WeExchange Wallet until a User made a

withdrawal request.  Although Users' bitcoins were commingled, Montroll kept a ledger of

bitcoin debits and credits for each User, which he could and did at times alter manually. Montroll had control over WeExchange and the WeExchange Wallet at all times. The majority of bitcoins in that wallet belonged to BitFunder Users and the remaining bitcoins belonged to Montroll and/or WeExchange account holders that did not register with BitFunder.

BitFunder Account Openings

18. Any individual or group was permitted to register, for no charge, as a User on BitFunder's platform. The only information required in order to register with BitFunder was a valid email address, so Users were permitted a level of anonymity. Once registered, a User could view his or her account history and balance online. During the relevant period, more than 6,500 Users registered online with BitFunder, and approximately 3,000 of those Users had active accounts.

Listing of Initial and Secondary Offerings on BitFunder

19. In order to offer and sell shares of an Asset on BitFunder, a User would contact Montroll through BitFunder and seek his approval. Typically, Montroll would provide the User with the ability to upload and post information about their proposed Asset on BitFunder's website. Initially, BitFunder did not have any formal, written listing requirements, but denied many of the Assets that sought listing. The requirements for listing evolved over time and, beginning in or around March 2013, as the popularity of BitFunder grew, Montroll began to require any User that sought to list an Asset on BitFunder's website to verify his or her identity by uploading certain documentation, including a government issued photo ID, with WeExchange. Under certain circumstances, Montroll would "disable" an Asset from public view.

20. Once Montroll approved an Asset for listing on BitFunder, the User promoting

the Asset (referred to as "Asset Issuer" on the BitFunder website) would be able to create

issuances of shares and list initial and secondary offerings of those shares.  The shares were

uncertificated, and the issuance and ownership of shares was reflected in online account

statements that Montroll maintained for each of the platform's Users.  Many of the "Asset

shares" paid dividends in bitcoins, which were automatically credited to Users' accounts and

could be withdrawn at any time.  For each Asset, Montroll also published a list of shareholders –

identified by bitcoin address – and their respective holdings so that the Asset Issuer could

continue to interact with shareholders if BitFunder were to cease operations.

21.     During the relevant period, approximately 56 Asset Issuers listed their shares with

BitFunder (i.e., 56 Assets).  None of the Asset Issuers had filed any registration statements with

the Commission.  Although BitFunder's website indicated that it charged each issuer a flat fee of

5 bitcoins in order to list and advertise the sale of "shares," Montroll collected the listing fee on

only a few occasions.

### Trading, Trade Execution and Trade Reporting on BitFunder

22.     Through BitFunder's platform, Users could buy and sell shares of Assets in initial

and follow on offerings without any restrictions.  Users also could buy and sell shares of Assets

in secondary market trading.  Specifically, BitFunder used an electronic system that allowed

multiple Users to post bids and offers for listed Assets that Users obtained in an initial offering.

For example, a User could buy or sell shares in an Asset by entering limit orders or market

orders on the platform, which would then match against orders resting on the system from other

Users based on pre-programmed order interaction protocols established by Montroll.  Orders in

BitFunder were placed on an anonymous basis and would match based on price and time priority

established by Montroll.  Upon a match, BitFunder would automatically execute the orders.

23.     BitFunder did not receive orders for any securities from anyone other than BitFunder Users, nor did it route its respective Users' orders to any other trading venue. BitFunder publicly displayed all its quotes, trades, and daily trading volume in all of its listed Assets on its website.  In exchange for these services, BitFunder charged a transaction-based fee (ranging between 0.5% to 1% depending on the User's trading volume) whenever a User sold "Asset shares."  During the relevant period (December 2012 to November 2013), the BitFunder platform executed approximately 88,500 buy and sell transactions in initial offerings and secondary market transactions.

24.     BitFunder's system automatically deducted site fees from User accounts and created a separate accounting reserve for those fees.  Montroll manually calculated how much BitFunder was owed in accrued site fees and withdrew those site fees from the WeExchange wallet from time to time.  Montroll did not keep any records of these transactions.  Based on the evidence it collected, the Commission estimates that BitFunder earned a total of 1,193 bitcoins (worth approximately $109,040 at that time the fees were paid) during the relevant period.

**Montroll Withdraws Bitcoins From the WeExchange Wallet and Converts Bitcoins into Fiat in Order to Pay Personal Expenses, Without Disclosure**

25.     Between December 2012 through June 2013, Montroll withdrew 4,968 bitcoins from the WeExchange Wallet that held bitcoin belonging to Users.  Based on the evidence it collected, the Commission estimates that BitFunder only earned a total of 560 bitcoins in cumulative fees from December 2012 through June 2013.  The amount of bitcoin that Montroll withdrew far exceeds any amounts Montroll may have been entitled to in fees from the BitFunder platform during that time period.    Montroll never disclosed that he would use the bitcoins deposited into the WeExchange Wallet for his own personal use.

26.     Of those 4,968 bitcoins withdrawn by Montroll between December 2012 through

June 2013, Montroll deposited 1,280.55 bitcoins into his account at Mt. Gox, a virtual currency exchange that operated during the relevant period.  Montroll then exchanged the bitcoins for USD and used the proceeds to pay personal expenses.  For example, between March 29, 2013 and May 9, 2013, Montroll wired $28,622 from Mt. Gox to his account at Citibank.  Along with deposits of $24,111 from other unidentified sources, Montroll used those funds to pay various expenses: $13,172 for what appear to be travel-related expenses; $10,667 to a mortgage loan servicing company; $4,029 for a variety of retail, restaurant, grocery, entertainment, and other miscellaneous expenses; $4,830 in cash withdrawals; and other various expenses.

27.     Additionally, of those 4,968 bitcoins withdrawn by Montroll, Montroll sent 2,188 bitcoins to BTC Trading, Corp., a bitcoin-denominated exchange similar to BitFunder where Montroll maintained a personal account, and 100 bitcoins to MPEX.co, a virtual currency exchange based in Romania.   Montroll also used 415 of those bitcoins to purchase shares of one of the Assets listed on BitFunder in private transactions.  Montroll withdrew the remaining 983 bitcoins to 25 different bitcoin addresses.  Because of the pseudonymous nature of bitcoin transactions, it is currently unknown to whom Montroll sent the bitcoins or the purpose of the transactions.

**Montroll Creates and Sells Shares of Unregistered Securities Called "Ukyo.Loan" and Engages in Fraud in the Offer and Sale of These Securities**

28.     During the period July 18, 2013 until BitFunder ceased operations in mid-November 2013, Montroll offered and sold approximately 229,444 shares of Ukyo Notes (named "Ukyo.Loan" after Montroll's online alias "Ukyo") on BitFunder's platform as one of its listed Assets.  Montroll offered the Ukyo Notes at 0.01 BTC per note; any User was eligible to purchase shares as an investor in the Ukyo Notes offering.

29.     Montroll posted a one page description of the Ukyo Notes on BitFunder's website

and on the Bitcoin Forum. That description of his offering stated that the money would fund a

"personal loan" that Montroll would use for "private investment purposes."  Contrary to these

representations, Montroll used a portion of the proceeds of the offering to replenish bitcoins he

previously misappropriated from the WeExchange Wallet prior to the offering.  Montroll also

used at least a portion of the proceeds of the offering (more than $10,000) to pay personal

expenses, including retail, restaurant, grocery, and entertainment expenses, which was not

disclosed to investors.

      30.    Montroll told investors to "think of [the Ukyo Notes] as a sort of round-about

investment" in BitFunder and WeExchange.  In response to questions posted on the Bitcoin

Forum from prospective shareholders regarding the use of funds, Montroll stated:  "Some of [the

money raised] will be for some new things for WeExchange.  So part of it is definitely for

Bitcoin related activities.  Other parts are just offline business opportunities."

      31.    Montroll promised to pay shareholders a daily interest of 0.05% (0.000005 BTC),

which he later suggested, in a post on the Bitcoin Forum, would be paid from BitFunder's

earnings and was something he could easily afford to pay:  "We are talking about 1.5 BTC

[interest] per day at absolute max.  BitFunder easily makes that."

      32.    Although he stated he would pay daily interest of 0.05%, Montroll initially paid

higher returns (between 0.075% and 0.10%) on July 28, 2013 and on various days in August.  On

July 30, Montroll posted on the Bitcoin Forum that the higher returns were associated with

BitFunder's increased earnings:  "With BitFunder doing so well lately I thought it would be a

nice surprise"; and "'Thank you' to all the BitFunder users :) (At least those with shares. lol)."

Finally, on August 9, Montroll posted the following, stating the higher interest payments were

not guaranteed:  "No promises of higher amounts.  BitFunder's done well last few days.  Just

giving a little back as thanks for support. :)."

33.     From July 18, 2013 through September 14, 2013, Montroll raised 2,282.44 bitcoins from the sale of approximately 229,444 Ukyo Notes and paid investors a total of 86.25 bitcoins in interest.  However, Montroll stopped paying interest to Ukyo Noteholders in early November 2013 and failed to honor many redemption requests from noteholders soon after BitFunder ceased operations.  Through the BitFunder platform, Users also engaged in secondary trading of the Ukyo Notes at prices that fluctuated above and below the offering price.

34.     The Ukyo Notes are securities and no registration statement was filed as to any of the Ukyo Notes offered and sold to investors.  No exemptions from registration apply to the Ukyo Note transactions.  Montroll used the instrumentalities of interstate commerce – the Internet – to effect the distributions.

### Montroll Fails to Disclose a Cyberattack on BitFunder's Platform that Resulted in the Theft of 6,062 Bitcoins from the WeExchange Wallet

35.     Over the course of five weeks, beginning on July 28, 2013, and continuing through August 27, 2013, a group of BitFunder Users engaged in a cyberattack on BitFunder's platform that resulted in the theft of approximately 6,062 bitcoins, approximately two thirds of which was stolen at the end of July 2013.  As of August 27, 2013, the stolen bitcoins were valued at $775,075 and represented approximately 72% of the highest average daily balance of bitcoins that WeExchange wallet held on behalf of BitFunder's Users during the relevant five week period.  The attackers exploited a vulnerability in the code Montroll wrote, using multiple BitFunder User accounts to initiate multiple trades that generated fictitious earnings – in the form of bitcoins – in their respective BitFunder User accounts.   After the attackers' accounts were credited with bitcoins, the group immediately withdrew and transferred the bitcoins from the WeExchange wallet to other bitcoin addresses controlled by the attackers.

12

36.     As early as July 30, 2013 and during the period he offered and sold the Ukyo

Notes, Montroll knew of the cyberattack and the bitcoin theft.  In an online chat that day with the

CEO of a certain virtual currency exchange, Montroll revealed that approximately 3,000 to 5,000

bitcoins had been stolen from the WeExchange wallet and asked the CEO whether he could help

trace the stolen bitcoins.   Montroll also stated that it "would look bad" if he didn't "bit[e] the

bullet on this one."

37.     After the bitcoin theft, Montroll failed to deposit sufficient bitcoins into the

WeExchange wallet in order to restore the wallet to its previous bitcoin balance prior to the theft.

As a result, Montroll allowed BitFunder and WeExchange to continue to operate under a hidden

deficit until he shut down BitFunder's website in early November 2013.  Montroll failed to

disclose the theft and the deficit to Ukyo Notes investors and potential investors.  By failing to

disclose these facts, Montroll misled investors and potential investors – who were led to believe

they would profit, at least in part, from BitFunder's operations – to reasonably believe that

BitFunder was a secure and profitable business.

38.     Montroll misappropriated investor proceeds and purposely hid the cyberattack

and bitcoin theft from BitFunder Users, including prospective and actual Ukyo Note purchasers,

in order to allow BitFunder to continue to operate as an unregistered exchange and earn site fees

and to continue to raise proceeds for the Ukyo Note offering.  Montroll knew, or was reckless in

not knowing, that his withdrawals were a misuse of Users' and Ukyo Note purchasers' funds.  In

addition, by continuing to allow BitFunder to operate, Montroll used new User deposits to

replenish a portion of the bitcoins that had been stolen from the WeExchange wallet to fund

withdrawal requests after the cyberattack.

**Following the Cyberattack, Montroll Withdraws Additional Bitcoins From the**
**WeExchange Wallet and Converts Bitcoins into Fiat in Order to Pay Personal Expenses**

39.     Following the cyberattack and bitcoin theft and up until BitFunder ceased

operations in November 2013, Montroll continued to withdraw bitcoins from the WeExchange

Wallet.  Based on the evidence it collected, the Commission estimates that Montroll withdrew an

additional 3,058 bitcoins (worth approximately $345,153 at the time) from the WeExchange

Wallet from July 1, 2013 through November 30, 2013.  Montroll's withdrawals are attributable,

in part, to proceeds from the Ukyo Note Offering, BitFunder's earnings from site fees, and other

income.

40.     As with his previous withdrawals, Montroll exchanged the bitcoins for USD and

used a portion of the proceeds to pay personal expenses.  Of the 3,058 bitcoins that Montroll

withdrew from the wallet during this time period, Montroll deposited a total of 730 bitcoins into

his account at BitStamp, where he exchanged the bitcoins for USD totaling $79,146.91

(excluding $379.92 he paid BitStamp in transaction fees) and then wired those funds into his

personal account at Wells Fargo.   Montroll also wired an additional $68,946.80 (proceeds from

sales of bitcoins deposited prior to July 2013) from Mt. Gox.

41.     Montroll sent 1,554 of the 3,058 bitcoins to BTC Trading Corp. and sold 20 of

those bitcoins to a User through his PayPal account.  Montroll withdrew the remaining 753

bitcoins to 12 different bitcoin addresses.  Because of the pseudonymous nature of bitcoin

transactions, in is currently unknown to whom Montroll sent the bitcoins or the purpose of the

transactions.

**Montroll Shuts Down BitFunder**

42.     On November 8, 2013, Montroll announced that he planned to shut down

BitFunder's operations completely and that all Users would be prohibited from entering into new

14

positions or selling any positions after November 14, 2013.  In or around the same time,

BitFunder Users posted threads on the Bitcoin Forum and elsewhere that they were experiencing

problems withdrawing bitcoins from the WeExchange wallet.  Indeed, while Montroll claimed

that BitFunder's WeExchange wallet's balance was 6,697 bitcoins around this same time, in fact

WeExchange wallet's balance for BitFunder and non BitFunder Users was only about 140-150

bitcoins.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Montroll and BitFunder)**

43.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 42 of this Complaint.

44.     By virtue of the foregoing, Defendants, directly or indirectly, by the use of the

means and instrumentalities of interstate commerce or of the mails, in connection with the

purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices

to defraud, made untrue statements of material fact and omitted to state material facts necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading, and engaged in acts, practices, and courses of business which operate or would

operate as a fraud or deceit.

45.     By virtue of the foregoing, the Defendants violated, and unless restrained and

enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and

Rule 10b-5 [17 C.F.R. § 240.10b-5], promulgated thereunder.

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Montroll)**

46.     The Commission realleges and incorporates by reference herein each and every

15

allegation contained in paragraphs 1 through 42 of this Complaint.

47.     By virtue of the foregoing, in the offer or sale of securities, by the use of the

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly, Montroll: (a) employed devices, schemes or artifices to defraud; (b)

obtained money or property by means of an untrue statement of a material fact or omitted to state

a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and/or (c) engaged in transactions, practices or

courses of business which operate or would operate as a fraud or deceit upon the purchaser.

48.     By virtue of the foregoing, Montroll, directly or indirectly violated and, unless

enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Montroll)**

49.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 42 of this Complaint.

50.     By virtue of the foregoing, (a) without a registration statement in effect as to that

security, Montroll, directly or indirectly, made use of the means and instruments of

transportation or communications in interstate commerce and of the mails to sell securities

through the use of means of a prospectus, and (b) made use of the means and instruments of

transportation or communication in interstate commerce and of the mails to offer to sell through

the use of a prospectus, securities as to which no registration statement had been filed.

51.     By reason of the conduct described above, Montroll, directly or indirectly violated

and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§

77e(a) and e(c)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Section 5 of the Exchange Act**
**(BitFunder)**

52.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 42 of this Complaint.

53.     By virtue of the foregoing, BitFunder, without being registered as a national

securities exchange or exempted from such registration, directly or indirectly, by the use of the

means and instrumentalities of interstate commerce or of the mails, acted as an exchange and

effected transactions in securities and/or reported such transactions.

54.     By virtue of the foregoing, the BitFunder violated, and unless restrained and

enjoined will continue to violate, Section 5 of the Exchange Act [15 U.S.C. § 78e].

**FOURTH CLAIM FOR RELIEF**
**Control Person Liability for Violations of Section 5 of the Exchange Act**
**(Montroll)**

55.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 42 of this Complaint.

56.     As alleged above, BitFunder violated Section 5 of the Exchange Act [15 U.S.C. §

78e].

57.     During the relevant period, Montroll controlled BitFunder and was a culpable

participant in BitFunder's violation of Section 5 of the Exchange Act [15 U.S.C. § 78e].

58.     By virtue of the foregoing, Montroll is liable as a controlling person pursuant to

Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for the violations of Section 5 of the Exchange

Act [15 U.S.C. § 78e] by BitFunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Defendants their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], promulgated thereunder;

### III.

Permanently restraining and enjoining Montroll and his respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)] and 17(a) [15 U.S.C. § 77q(a)];

### IV.

Permanently restraining and enjoining BitFunder and its respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 5 of the Exchange Act [15 U.S.C. § 78e];

**V.**

Permanently restraining and enjoining Montroll and his respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations, or controlling – pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] – any person's violations, of Section 5 of the Exchange Act [15 U.S.C. § 78e];

**VI.**

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

**VII.**

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## VIII.

Granting such other and further relief as this Court deems just and proper.

Dated: February 21, 2018
      New York, New York

By:    **s/ Marc P. Berger**
        Marc P. Berger
        Lara S. Mehraban
        Valerie A. Szczepanik
        Dugan Bliss
        Daphna A. Waxman
        Attorneys for Plaintiff
        SECURITIES AND EXCHANGE COMMISSION
        New York Regional Office
        200 Vesey Street, Suite 400
        New York, New York 10281-1022
        (212) 336-0971 (Bliss)
        Email: BlissD@sec.gov